**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **WILLIE A. GARRETT, JR.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 12 C 5522** |
| | ) | |
| **CAROLYN W. COLVIN, Acting** | ) | **Magistrate Judge Finnegan** |
| **Commissioner of Social Security,[1]** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Willie A. Garrett, Jr. brings this action under 42 U.S.C. § 405(g), seeking to overturn the final decision of the Commissioner of Social Security ("Commissioner") denying his applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI, respectively, of the Social Security Act. The parties consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). Plaintiff subsequently filed a motion seeking reversal of the Administrative Law Judge's decision, and the Commissioner filed a motion for summary judgment affirming the decision. After careful review of the parties' briefs and the record, the Court now denies Plaintiff's motion and grants the Commissioner's motion.

## PROCEDURAL HISTORY

Plaintiff applied for DIB and SSI on May 2, 2008, alleging that he became disabled beginning on April 12, 2008 due to sleep apnea. (R. 25, 248). The Social Security Administration denied the application initially on July 29, 2008, and again on

---

[1] On February 14, 2013, Carolyn W. Colvin became Acting Commissioner of Social Security, and is automatically substituted as Defendant in this case pursuant to Federal Rule of Civil Procedure 25(d)(1).

reconsideration on December 11, 2008. (R. 19). Pursuant to Plaintiff's timely request, Administrative Law Judge ("ALJ") Curt Marceille held a hearing on March 23, 2010, followed by a second hearing on September 16, 2010 (due to a recording malfunction at the first hearing), where he heard testimony from Plaintiff, represented by counsel, and a vocational expert. (R. 25, 36-85). On October 25, 2010, the ALJ found that Plaintiff, then 51 years old, is not disabled because he is capable of performing jobs that exist in significant numbers in the national economy. (R. 34-35). The Appeals Council denied Plaintiff's request for review on February 9, 2012. (R. 7-9).

Plaintiff now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner. In his motion, Plaintiff argues that the ALJ erred in four respects: (1) the ALJ gave little weight to his treating physician regarding his back pain and sleep apnea; (2) the ALJ's credibility finding was unsupported; (3) the ALJ failed to consider Plaintiff's obesity or sleep apnea in determining his Residual Functional Capacity; and (4) the ALJ should have limited him to sedentary work, rather than light work, resulting in a finding of disability under the Medical Vocational Guidelines ("the Grid").

## **FACTUAL BACKGROUND**

Plaintiff was born on July 17, 1959, making him 48 years old (defined as a "younger individual") on the alleged disability onset date, but placing him in the "approaching advanced age" category by the time his hearings took place. (R. 34). He graduated from high school and is able to communicate in English. (R. 34, 72). His past relevant work was as an institutional cleaner and a grocery stock person. (R. 34).

**A.      Plaintiff's Medical History**

The medical conditions at issue in this matter are Plaintiff's sleep apnea, back pain, and obesity.  The earliest documentation in the record begins around the time of Plaintiff's alleged disability onset date in April 2008.  On April 1, 2008, he presented to Dr. Rama Medavaram of Dolton Medical Center complaining of, among other things, daytime sleepiness which had persisted over the last few years.  (R. 338).  Dr. Medavaram's assessment included obesity and sleep apnea, for which he recommended a sleep study.  (R. 340).

On April 12, 2008, Plaintiff underwent the recommended sleep study consisting of a nocturnal polysomnogram.  Dr. Kevin Fagan of Ingalls Memorial Hospital summarized Plaintiff's relevant medical history as follows:

> This is an evaluation of a 48-year-old with a question of sleep apnea, who has been sleepy during the day for the last decade, and snores.  He lives with his wife and does stock work at Jewel.  He works from 10 p.m. to 6 a.m., so typically sleeps from 7 a.m. until 12:30, which is only 5-1/2 hours, although he sleeps more on the weekends.  He is severely sleepy during the day, driving, and at work, and does complain of restless legs.  Respiratory pauses have been observed, and he does awaken with palpitations but not short of breath.  He has trouble with breathing through his nose due to some blockage.  His weight is stable at 248 pounds and 5 feet 9 inches of height, for a BMI of 37.  He smokes but does not abuse caffeine or alcohol.  He never had his tonsils out.  Medical problems include reflux, for which he is taking Prilosec.  There is no family history of sleep apnea or narcolepsy.

(R. 343).  The polysomnography results showed that Plaintiff "had an apnea/hypopnea index of 94 events per hour, leading to desaturations of 50% from a baseline in the mid 90s."  (*Id.*)  Plaintiff "was treated with CPAP[2] during the remaining few hours," which

---

[2]      "CPAP, or continuous positive airway pressure, is a treatment that uses mild air pressure to keep the airways open.  CPAP typically is used by people who have breathing problems, such as sleep apnea."  U.S. Department of Health & Human Services, National Heart, Lung, and Blood Institute, http://www.nhlbi.nih.gov/health/health-topics/topics/cpap/ (last viewed

produced "effective control, or nearly complete control, of his sleep apnea, with marked REM rebound." (*Id.*) Plaintiff "woke up, however, and was described as having a panic attack on that and could not bring himself to put the mask back on." (*Id.*) In summary, Dr. Fagan concluded that Plaintiff "demonstrates severe obstructive sleep apnea, which is much improved on CPAP at 21/16 cm of water pressure BiPAP, using the Comfort Gel nasal mask from Respironics, size medium." (R. 343-44). He also diagnosed Plaintiff with shift work sleep disorder. (R. 344). Dr. Fagan recommended that Plaintiff attend a CPAP desensitization program, consult an otolaryngologist to evaluate his upper airway and thyroid, and lose weight. (*Id.*)

On April 22, 2008, Sleep Solutions, Inc. came to Plaintiff's home to set up his prescribed CPAP machine and explain the use and maintenance of the equipment. (R. 465). Sleep Solutions' follow-up notes indicate that two days later, on April 24, Plaintiff reported "very little use" of the machine, wearing the mask approximately one and a half hours per night. (*Id.*) Plaintiff reported "difficulty falling asleep but is continuing to try and increase use." (*Id.*) Six days later, on April 30, Sleep Solutions noted that Plaintiff is "still struggling to get beyond 1-2 hrs" and "[n]o major progress yet, but still committed to trying." (*Id.*)

The next day, on May 1, 2008, Plaintiff had a follow-up visit with Dr. Medavaram, who noted that Plaintiff underwent the sleep study, shows severe sleep apnea, and is now using a CPAP machine. (R. 337). He advised Plaintiff to follow a low-calorie diet and continue use of the CPAP machine. (*Id.*) Dr. Medavaram did not note the

---

Aug. 5, 2013). Treatment involves a CPAP machine, which has three main parts: a mask or other device that fits over the nose or nose and mouth, a tube that connects the mask to the machine's motor, and a motor that blows air into the tube. (*Id.*)

difficulties that Plaintiff reported to Sleep Solutions. On May 20, 2008, Sleep Solutions noted that Plaintiff was "still struggling wearing [the mask] more than 2 hrs due to 'bad dreams' and episodes of not breathing," and that Plaintiff was to discuss this with his doctor. (R. 464). Two days later, on May 22, 2008, Dr. Medavaram noted that Plaintiff was using the CPAP machine, had lost 5 pounds, and complained of stress and anxiety, but did not mention any difficulty using the CPAP machine. (R. 336).

On June 23, 2008, Plaintiff complained to Dr. Medavaram of low back pain radiating to the right lower extremities for the past few years, for which the doctor advised an EMG, an MRI, and Motrin. (R. 399). That same day, Dr. Medavaram completed a Respiratory Report form for the Illinois Disability Determination Services ("DDS"), stating the diagnosis of severe sleep apnea and obesity and describing the current therapy as use of a CPAP machine. (R. 360-61). The form also notes that Plaintiff has had low back pain "on and off" for one and a half years, and that he experiences "daytime drowsiness and [is] unable to work due to sleep apnea." (R. 360). An MRI on June 30, 2008 showed "[m]ild degenerative changes in the lumbar spine." (R. 409). An EMG of the right lower extremity on July 18, 2008 was normal. (R. 408). At a follow up visit on July 24, 2008, Plaintiff reported that he was using the CPAP machine and complained of low back pain, for which Dr. Medavaram referred him to Dr. Howard Robinson. (R. 390).

On July 28, 2008, Dr. Calixto Aquino completed a Physical Residual Functional Capacity Assessment for the DDS. (R. 373-80). Dr. Aquino stated a primary diagnosis of severe sleep apnea and a secondary diagnosis of low back pain. (R. 373). He concluded that Plaintiff can occasionally lift or carry 20 pounds, frequently lift or carry 10

pounds, stand and/or walk (with normal breaks) about 6 hours in an 8-hour work day, sit (with normal breaks) about 6 hours in an 8-hour work day, and has no limitations on his ability to push or pull. (R. 374). He found that Plaintiff is occasionally limited in stooping, kneeling, crouching, and climbing ramps or stairs, and is never able to climb ladders, ropes or scaffolds, due to severe obstructive sleep apnea and low back pain. (R. 375). Finally, he found that Plaintiff has no manipulative, visual, communicative, or environmental limitations, except that he should avoid even moderate exposure to hazards, such as machinery and heights, due to his history of severe sleep apnea with daytime sleepiness and fatigue. (R. 376-77). Dr. Aquino found Plaintiff's statements concerning his sleep apnea symptoms partially credible, taking into consideration the polysomnography report and other medical records from May and June 2008, but also noting that those records indicate improvement with use of the CPAP, which Plaintiff is currently using "with no indication of any difficulties," and given that "[c]urrent exams in file have been negative for any SOB [shortness of breath] or breathing problems." (R. 379-80).

On September 9, 2008, upon the referral of Dr. Medavaram, Plaintiff saw Dr. Howard Robinson complaining of low back pain radiating into his right lateral thigh, causing numbness and weakness. (R. 405). Upon physical examination, Plaintiff was "a little tender in his lumbar paraspinals and into the gluteal region, especially on the right," tender over his lateral thigh, and "severely limited" in all planes of lumbar range of motion." (R. 406). Plaintiff demonstrated "excellent range of motion of his hips," is "easily able to go from a sitting to a standing position," "has no significant lumbar shift or scoliosis," and balance is good. (*Id.*) An x-ray of his lumbar spine showed "mild

degenerative change," and Dr. Robinson ordered an MRI of the lumbar spine. (*Id.*) The radiologist's impression of the MRI, performed on September 15, 2008, was "mild dextro curvature and a minimal central disc protrusion at L4/5 without significant central canal or neural foraminal stenosis." (R. 407).

On September 30, 2008, Plaintiff saw Dr. Robinson for a routine follow-up regarding his right thigh pain. (R. 403). Dr. Robinson noted that the MRI "is essentially normal," although there is "a little bit of bulge at L4-5 according to his radiologist." (*Id.*) He noted that Plaintiff complains of "some pain" in his right thigh, which worsens when he tries to walk, and that he has been using a cane. (*Id.*) Dr. Robinson's physical examination revealed tenderness over the iliotibial bands, good range of motion of his hips, no focal weakness, and minimal tenderness over the greater trochanter. (*Id.*) He advised physical therapy for Plaintiff's thigh. (*Id.*)

A physical therapist evaluated Plaintiff on October 8, 2008 and recommended a therapy plan of twice weekly sessions for four weeks with "good" potential for rehabilitation. (R. 435-36). Midway through the plan, the physical therapist noted that Plaintiff lacked significant improvement and that his pain increased over the last session, with his right leg pain more limiting than his low back pain. (R. 433-34). On October 16, 2008, Plaintiff had a follow-up visit with Dr. Medavaram, who noted that Plaintiff had seen Dr. Robinson for his low back pain and began physical therapy to treat it. (R. 389).

On November 21, 2008, Dr. David Mack completed a Request for Medical Advice for the DDS upon reconsideration. (R. 391-93). Dr. Mack checked the box indicating that he had reviewed all the evidence in file and affirmed, as revised, the RFC dated

July 28, 2008 and the initial denial determination dated July 29, 2008. (R. 392-93). Dr. Mack stated that Plaintiff did not identify any worsening or new complications of his previously alleged conditions or the emergence of any new medical entities, thus "clearly nothing has changed." (R. 393). He further explained that Plaintiff produced no new medical evidence, other than "two pages of just simple visit notes which do nothing more than state what is already known[,] that this claimant complains of sleep apnea and reflux," and that Plaintiff "is morbidly obese, which would account for his alleged medical complaints." (*Id.*) Dr. Mack found Plaintiff "partially credible" regarding his alleged medical conditions, noting, among other things, that sleep apnea "is treatable and improvable with medical attention and the loss of weight." (*Id.*)

On February 6, 2009, Dr. Medavaram prepared an RFC assessment in which he identified Plaintiff's diagnoses as obesity, severe obstructive sleep apnea, and chronic low back pain. (R. 394). He stated that Plaintiff has various limitations, including needing breaks at unpredictable intervals and needing to avoid work that involves mainly standing and walking. (R. 396). He further stated that Plaintiff has serious nonexertional limitations in maintaining attention for two-hour segments, performing at a consistent pace, dealing with normal work stresses, maintaining socially appropriate behavior, traveling in unfamiliar places, and using public transportation. (*Id.*). Dr. Medavaram concluded that Plaintiff would be absent from work more than four times per month due to his impairments. (R. 397).

Plaintiff continued to complain of low back pain during follow-up visits to Dr. Medavaram on February 6 and March 12, 2009. (R. 414-15). On May 1, 2009, Dr. Medavaram noted that Plaintiff was using the CPAP machine and that he complained of

low back pain, radiating to his right lower extremities, for which he had seen Dr. Robinson and had a normal MRI. (R. 413). Dr. Medavaram did not see Plaintiff again after this office visit. (R. 478). However, more than 15 months later, on August 9, 2010, Dr. Medavaram completed a Physical RFC Questionnaire, concluding that Plaintiff could sit for 30 minutes before needing to stand, could stand for 45 minutes before needing to sit or walk, could sit and stand/walk for less than 2 hours in an eight-hour workday with normal breaks, and will need rest breaks every 45 minutes lasting 45 minutes each. (R. 478-79). He also concluded that Plaintiff must use a cane to stand/walk, can rarely lift less than 10 pounds and can never lift 10 pounds or more, and will have "good days" and "bad days" but will be absent more than four days per month due to his impairments. (R. 480).

There are no medical records for the period between Plaintiff's May 1, 2009 office visit with Dr. Medavaram and a June 17, 2010 wellness exam with Dr. Mohemad Khaleel at Ingalls Memorial Hospital. (R. 469-71). Dr. Khaleel's notes from the June 17 exam do not mention problems with sleep apnea or low back pain. (R. 469-71). However, Dr. Khaleel ordered an x-ray of Plaintiff's lumbarsacral spine, which was performed on August 19, 2010, and showed an impression of shallow scoliosis on the left and degenerative changes bilaterally at L5-S1. (R. 484). On September 15, 2010, Plaintiff complained of continued low back pain to Dr. Khaleel, who noted "no improvement" and prescribed Vicodin, Flexeril, and physical/occupational therapy. (R. 482-83).

**B.      The Hearings Before the ALJ**

The first of two hearings before an ALJ was held on March 23, 2010.  The ALJ's decision states that the second hearing, held on September 16, 2010, was required "due to a recording malfunction which failed to preserve the testimony at the [March] hearing."  (R. 25).  The record in this case contains a partial transcript for the March hearing (R. 67-85) and a complete transcript for the September hearing (R. 36-66), and the ALJ's decision discusses testimony from both.  Accordingly, the Court summarizes below the pertinent testimony from both hearings.

**1.      The March 23, 2010 Hearing**

At the hearing on March 23, 2010, Plaintiff testified that in June 2008 he quit his job as an overnight stocker at Jewel because he "was falling asleep at work" and "couldn't keep up with the other guys."  (R. 73-74).  Previously, in November 2002, he was fired from his job at the University of Chicago Hospital because he overslept during a break.  Plaintiff testified that he is unable to return to work because he's "always drowsy" and has nightmares and difficulty breathing when he uses the CPAP machine. (R. 76-77).  He experienced daytime sleepiness as far back as his University of Chicago job, but it became more frequent over the years.  (R. 79-80).

When the ALJ asked Plaintiff why none of the medical records noted that he had reported the CPAP problems to his doctors, Plaintiff replied that he reported it to every doctor he saw.  (R. 78).  The ALJ also inquired about an apparent lack of treatment after April or May 2008, including a gap in treatment from September 2008 to November 2009, to which Plaintiff replied that he did not see the doctor as often because he could not afford the $25 copayment required by his wife's insurance policy, under which he

was covered. (R. 80-83). He saw a doctor in November 2009 because his sister helped him with the copayments. (R. 83). In response to further questioning, Plaintiff testified that he previously smoked a pack a day but now smokes a pack every two days, sometimes going 2-3 days without smoking. (R. 80, 84)

Plaintiff also testified that he has trouble walking, for which his doctor prescribed physical therapy, and that he asked his doctor about getting a cane. (R. 85). The transcript ends at this point.

### 2. The September 16, 2010 Hearing

### a. Plaintiff's Testimony

At the second hearing, Plaintiff confirmed his prior hearing testimony that he suffers from daytime drowsiness and falling asleep on the job due to sleep apnea, and that he falls out of bed or wakes up sitting up in bed two to three times per week. (R. 41-42). He also confirmed his testimony that he has some pain in his right leg and back, has used a cane for walking since 2008, could lift 40-50 pounds, could stand 5-10 minutes at a time, and could sit with no problem. (*Id.*).

Plaintiff then testified that in the six months since the March 2010 hearing his back pain had worsened, moving from his low back to the center of his back and becoming "excruciating . . . all through the day." (R. 42). He testified that he "tried" to lift 10-15 pounds, but sometimes "can't even lift a bag of garbage" due to his back pain. (R. 43). He can stand for 2-5 minutes before "a cramping pain" in his back requires him to sit down, and rated his daily pain as a 10 on a scale of one to 10. (R. 47, 48). He takes Vicodin and Motrin for pain and Flexeril to relax his muscles. (R. 49). He also continues to experience pain in his right leg. (R. 53).

11

Regarding his sleep apnea symptoms, Plaintiff continues to experience daytime drowsiness throughout the day, including nodding off, taking naps, and falling asleep in the middle of conversations. (R. 43-44). He also continues to have difficulties with the CPAP machine, including nightmares and feeling "like it's taking my breath." (R. 44-45). He testified that "sometimes, without knowing, [he] will slap it off." (R. 45).

In terms of his work history, Plaintiff testified that he most recently worked as a part-time stocker at Jewel, but stopped because he was falling asleep on the job and had problems standing due to leg pain and numbness, causing his boss to tell him he would be fired if he was unable to do the work. (R. 54-56). He previously worked for 15 years at the University of Chicago. (R. 55).

### b.    Vocational Expert's Testimony

Stephen Sprauer testified at the hearing as a vocational expert ("VE"). (R. 57). The VE identified Plaintiff's past relevant work as an institutional cleaner at the University of Chicago Medical Center from 1998 to 2002, which was unskilled work, performed at the very heavy level, that "may go up to the low end of semiskilled today." (R. 57-58). In 2004 and 2005, Plaintiff worked as an institutional cleaner for several public schools and Mercy Hospital Medical Center doing unskilled, heavy or very heavy work. (R. 58). From October 2006 to June 2008, he worked part-time as an overnight stocker for Jewel-Osco doing semi-skilled, heavy to very heavy work. (R. 59).

The ALJ then described a hypothetical individual of Plaintiff's age, education, and work experience who is able to perform light work as defined by the regulations; can never climb ladders, ropes, scaffolds, ramps, or stairs; can occasionally balance, stoop, crouch, kneel, and crawl; and must avoid exposure to hazards, unprotected heights,

12

and moving machinery. (R. 59). The VE testified that such an individual would be unable to perform any of Plaintiff's past relevant work, and would be limited to "production-type jobs only, at the light range of physical exertion." (*Id.*). The VE further testified that representative production-type jobs at the light exertion level that such an individual could perform include assembler (3,000-4,000 positions), packer/packager (2,500-3,000), and inspector/sorter (4,000). (R. 60). At the medium level of exertion, there are 40,000 packer positions. (R. 61). The VE testified that he reduced the number of available light duty positions to account for workplaces where the employee might encounter ramps or stairs. (R. 62-63).

Plaintiff's attorney then revised the hypothetical to assume the same factors and limitations, but adding the additional limitation that the individual is "off task because he fell asleep on the job." (R. 63). The VE testified that such an individual would not be able to perform any of the jobs, and that an individual would be unable to sustain any full-time competitive employment if he fell asleep on the job on a daily basis. (*Id.*). While neither the ALJ nor Plaintiff's attorney questioned the VE about the availability of sedentary work for such an individual, the attorney argued in closing that Plaintiff, who turned 50 during the application process, is limited to sedentary work due to back and leg pain, and thus should be found disabled under the GRID. (R. 64-65).

## D. ALJ's Decision

In his decision, the ALJ found Plaintiff not disabled under the relevant provisions of the Social Security Act. (R. 25). In applying the five-step sequential analysis required by 20 C.F.R. § 404.1520(a), the ALJ first determined that Plaintiff has not engaged in substantial gainful activity since the alleged onset date of April 12, 2008.

(R. 27).  At Step 2, he determined that Plaintiff has the severe impairments of obstructive sleep apnea, gastroesophageal reflux disease (GERD), degenerative joint disease of the lumbar spine, and obesity.  (R. 27-28).  However, at Step 3, the ALJ determined that none of these impairments or combination of impairments met or medically equaled any of the listed impairments identified in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. 28).  Of particular relevance here, the ALJ considered Plaintiff's degenerative joint disease under Listing 1.04 in combination with his obesity, but found that the record does not demonstrative that Plaintiff is unable to ambulate effectively as defined by the listing, not does the record contain documentation of spinal stenosis or sensory, reflex, or motor deficits contemplated by the listing.  (*Id.*).  The ALJ also considered Plaintiff's sleep apnea under Listing 3.00, but found that, even in light of the exacerbatory effect of Plaintiff's obesity, the evidence does not indicate that his sleep apnea is of "sufficient severity of such uncontrolled nature while utilizing the prescribed CPAP" such that it meets or equals any part of the listing.  (*Id.*).

Proceeding to Step 4, the ALJ concluded that Plaintiff retains the residual functional capacity ("RFC") "to perform light work as defined in 20 C.F.R. 404.1567(b) except [Plaintiff] should never climb ladders, ropes, scaffolds, ramps, or stairs, and only occasionally balance, stoop, kneel, crouch, and crawl," and also "should avoid exposure to heights and hazards, as well as moving machinery."  (R. 28).  In reaching this determination, the ALJ considered Plaintiff's testimony, the objective medical evidence, and the opinion evidence.  (R. 28-34).  Concerning his sleep apnea symptoms, the ALJ noted as an initial matter that Plaintiff was able to maintain employment despite more than a decade of daytime sleepiness.  (R. 29-30).  The ALJ then discussed the

evidence he found persuasive, including the medical records which "clearly indicate that the claimant's sleep apnea was 'much improved' with the use of the CPAP mask," the absence of documentation of nightmares and shortness of breath beyond the initial assessment by Sleep Solutions in the few weeks after Plaintiff began using the CPAP machine, and the lack of any treatment between September 2008 and November 2009. (R. 30). Concerning his back and right leg pain, the ALJ relied upon the normal EMG of the right leg, an MRI of the lumbar spine that was "essentially normal and unremarkable," the lack of evidence of treatment after October 2008 or a prescription for the cane Plaintiff uses, and a May 2010 examination by Plaintiff's treating physician which found no back tenderness and normal use of extremities. (R. 31). The ALJ considered both of these impairments in combination with the "exacerbatory impact of [Plaintiff's] obesity." (R. 30, 31). The ALJ gave little weight to the August 2010 RFC assessment by Plaintiff's treating physician, Dr. Medavaram, because it is inconsistent with his February 2009 opinion and Plaintiff's testimony, lacks objective support, and shows that his treatment of Plaintiff was "sporadic at best," including noting that he had last seen Plaintiff 15 months prior to completing the RFC assessment. (R. 32-33). The ALJ assigned great weight to the RFC assessment prepared by state agency physician Dr. Aquino and affirmed by Dr. Mack given that their opinions were "well supported" and "generally consistent with the objective medical evidence." (*Id.*).

The ALJ found Plaintiff "not fully credible" in light of the lack of evidentiary support for his allegations of an extreme degree of limitation, particularly his "very conservative" and "extremely sparse and sporadic" treatment, the lack of evidence of strong medication or physical therapy to treat his alleged disabling pain, and the

absence of any evidence after May 2008 to indicate that Plaintiff is unable to use the CPAP mask without severe nightmares. (R. 33). In addition, the ALJ found that Plaintiff's explanation for the gap in treatment – his inability to pay – was not credible because he was covered by his wife's insurance and would have been responsible only for the $25 co-payment, and he spent $150 per month on cigarettes. (R. 30).

The ALJ then found that Plaintiff is unable to perform his past relevant work, but relying on the VE, concluded that there are other jobs that exist in sufficient numbers in the Chicago Region that Plaintiff can perform, given his age, education, work experience, and RFC. (R. 34-35). Accordingly, the ALJ found that Plaintiff was not disabled since his alleged disability onset date. (R. 35).

## DISCUSSION

### A.    Disability Standard

A claimant who can establish he is "disabled" as defined by the Social Security Act, and was insured for benefits when his disability arose, is entitled to Disability Insurance Benefits. 42 U.S.C. §§ 423(a)(1)(A), (E); *see also Liskowitz v. Astrue*, 559 F.3d 736, 739-40 (7th Cir. 2009). In order to qualify for Supplemental Security Income, a claimant must establish that he is "disabled" and eligible for SSI benefits as defined by the Social Security Act. 42 U.S.C. §§ 416(i)(1), 1382a(1). "Disability" means an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382a(3)(A). An individual is under a disability if he is unable to do his previous work

and cannot, considering his age, education, and work experience, engage in any gainful employment that exists in the national economy. *Id.* at § 423(d)(2)(A).

In order to determine whether a claimant is disabled, the ALJ conducts a standard five-step inquiry, set forth in 20 C.F.R. § 404.1520(a)(4), which requires the ALJ to consider in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the impairment meets or equals one of a list of specific impairments enumerated in the regulations; (4) whether the claimant can perform his past relevant work; and (5) whether the claimant is able to perform other work in the national economy. *Zurawski v. Halter*, 245 F.3d 881, 885 (7th Cir. 2001) (citations omitted). "An affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that a claimant is not disabled." *Id.* (quoting *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985)); *see also* 20 C.F.R. § 404.1520(a)(4).

**B.    Standard of Review**

Judicial review of the Commissioner's final decision is authorized by Section 405(g) of the Social Security Act. 42 U.S.C. § 405(g). A "court will reverse an ALJ's denial of disability benefits only if the decision is not supported by substantial evidence or is based on an error of law." *Nelms v. Astrue*, 553 F.3d 1093, 1097 (7th Cir. 2009). Evidence is considered substantial "so long as it is 'sufficient for a reasonable person to accept as adequate to support the decision.'" *Ketelboeter v. Astrue*, 550 F.3d 620, 624 (7th Cir. 2008) (quoting *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003)). The reviewing court may not "displace the ALJ's judgment by reconsidering facts or

evidence, or by making independent credibility determinations." *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). Even when there is adequate evidence in the record to support the decision, however, the findings will not be upheld if the ALJ does not "'build an accurate and logical bridge from the evidence to the conclusion.'" *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008) (quoting *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000)); *see also* 42 U.S.C. § 405(b)(1) (denial of benefits must contain a discussion of the evidence and a statement of the Commissioner's reasons).

## C.  Analysis

The Court now addresses in turn each of Plaintiff's four arguments challenging the ALJ's decision.

### 1.  The Opinion of Treating Physician Dr. Rama Medavaram

Plaintiff first argues that the ALJ erred by failing to give significant weight to the opinion of his treating physician, Dr. Rama Medavaram. Specifically, Plaintiff asserts that the ALJ should have given significant weight to the following three opinions that Dr. Medavaram submitted in conjunction with Plaintiff's application for disability benefits: (1) a Respiratory Report form completed on June 23, 2008 (R. 360-61); (2) a Sleep Disorders RFC Questionnaire completed on February 6, 2009 (R. 394-97); and (3) a Physical RFC Questionnaire completed on August 9, 2010 (R. 478-80). (Doc. 21 at 7).

It is well-established that a treating physician's opinion is entitled to controlling weight if two conditions are met: (1) the opinion is "well-supported" by "medically acceptable clinical and laboratory diagnostic techniques" and (2) the opinion is "not inconsistent with the other substantial evidence" in the record. 20 C.F.R. § 416.927(d)(2); *see Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011); *Punzio v.*

*Astrue*, 630 F.3d 704, 710 (7th Cir. 2011); *Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010); *Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001)*; Clifford*, 227 F.3d at 870. If the opinion is contradicted by other evidence or is internally inconsistent, the ALJ may discount it so long as he provides an adequate explanation for doing so. *Punzio*, 630 F.3d at 710; *Schaaf*, 602 F.3d at 875; *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007).

Here, the ALJ did exactly that. He concluded that Mr. Medavaram's August 2010 opinion was "inconsistent with his opinion from Feb. 2009, [and] fails to document any other objective or significant signs to support it." (R. 32). For example, the ALJ notes that the February 2009 assessment restricts Plaintiff to lifting 25 pounds maximum and 10 pounds occasionally, while the August 2010 assessment further restricts him to 10 pounds maximum and only rarely lifting less than 10 pounds, but provides no objective or other evidence to support this significantly more restrictive assessment. (R. 32). The February 2009 assessment makes no mention of any sitting limitations, while the August 2010 assessment inexplicably limits Plaintiff to sitting for no more than 30 minutes. (*Id.*, citing R. 394-97, 479). The ALJ also observes that Dr. Medavaram's August 2010 opinion is "patently inconsistent with the claimant's testimony, which indicated he could lift 40-50 pounds and sit without limitation." (R. 32). In addition, the ALJ relies upon the absence of any "significant objective treatment history or record for back pain," observing in fact that "there is no evidence in the record that Dr. Medavaram ever provided any significant treatment to the claimant for back pain." (*Id.*) While Plaintiff argues that the August 2010 assessment is consistent with Plaintiff's testimony the following month as to his worsened condition, it is undisputed that Dr. Medavaram

did not examine or speak with Plaintiff in the 15 months prior to the August 2010 assessment. (R. 478). So the fact that Plaintiff's subjective testimony in September 2010 conforms to the August 2010 assessment does not establish that the assessment itself is supported by objective medical evidence. Plaintiff also argues that "Dr. Medavaram prescribed [Plaintiff] Motrin, Vicodin, and Flexeril for his severe lower back pain," but the first document he cites shows only a Motrin prescription from Dr. Medavaram in March 2009, while the second document he cites is from Dr. Khaleel and post-dates all of Dr. Medavaram's opinions. (Doc. 21 at 10, citing R. 414, 482). Based on this contradictory and inconsistent evidence, the ALJ had a well-reasoned basis for declining to give significant weight to Dr. Medavaram's opinions.

But the ALJ's rationale did not stop there. The regulations specify that when an ALJ does not give controlling weight to a treating source's opinion, the ALJ will consider other factors to determine how much weight to give the opinion, namely (1) length of the treatment relationship and frequency of examinations, (2) nature and extent of the treatment relationship, (3) supportability of the opinion with evidence, particularly medical signs and laboratory findings, (4) consistency of the opinion with the record as a whole, (5) the source's area of specialty, and (6) other factors the claimant or others bring to the ALJ's attention. *See* 20 C.F.R. § 416.927(d)(2)-(6). Here, the ALJ provided a thorough discussion of the factors in determining to assign little weight to Dr. Medavaram's opinions.

According to the record, Plaintiff saw Dr. Medavaram for his sleep apnea, back pain and obesity, among other ailments, on nine occasions over the course of 13 months from April 1, 2008 to May 1, 2009. (R. 336-38, 389-90, 399, 413-15). In his

August 2010 RFC assessment, completed approximately five weeks prior to the second hearing before the ALJ, Dr. Medavaram acknowledged that he had not seen Plaintiff in more than 15 months. (R. 478-79). In assessing how much weight to give Dr. Medavaram's opinions, the ALJ relied heavily on these factors, namely that Dr. Medarvaram's treatment of Plaintiff "has been sporadic at best, with virtually no treatment for an extended period of time," and that he "lacks any type of longitudinal treatment history or familiarity with the claimant's condition to warrant giving his opinion significant weight," particularly given that "[h]is most recent (and most limiting) opinion comes a full 15 months after the last time he saw the claimant." (R. 32-33). The ALJ also noted that "there is virtually no record support for Dr. Medavaram's opinions," emphasizing that "he provide[s] no clinical signs or objective findings apart from tenderness with flexion and extension," and that the "medical records indicate that this [August 2010] assessment, like his others, was based primarily if not solely on the claimant's subjective complaints." (R. 33). Plaintiff argues that a finding of severe back pain is supported by an exam and MRI in 2008 and an x-ray in 2010, but those tests found only mild degenerative changes. (Doc. 21 at 9, citing R. 384, 409, 484). The ALJ further explained that the medical records do not show that Dr. Medavaram "ever provided any significant treatment to the claimant for back pain." (R. 32). Indeed, beginning in July 2008, Plaintiff saw Dr. Robinson for his back pain, upon referral from Dr. Medavaram, and it was Dr. Robinson who found the September 2008 spinal MRI to be "essentially normal" and performed a physical examination that was mostly normal other than tenderness in the knees. (R. 390, 403). Finally, the ALJ emphasizes how Dr. Medavaram's opinions indicating severe restrictions are inconsistent with the

Plaintiff's work history over a period of twelve years during which he suffered from sleep apnea, and the absence of any indication that Plaintiff reported to his treating physicians that his sleep apnea had worsened.  (R. 33).

For these reasons, the ALJ's determination to assign little weight to the three assessments prepared by Dr. Medavaram is supported by substantial evidence.

### 2.    The Credibility Assessment

The Court next turns to Plaintiff's challenge to the ALJ's credibility finding concerning his complaints of debilitating daytime drowsiness due to his sleep apnea. Hearing officers are in the best position to evaluate a witness's credibility and their assessment will be reversed only if "patently wrong."  *Schaaf*, 602 F.3d at 875; *Castile v. Astrue*, 617 F.3d 923, 929 (7th Cir. 2010).  Still, an ALJ must connect his credibility determinations to the record evidence by an "'accurate and logical bridge.'"  *Castile*, 617 F.3d at 929 (quoting *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000)).

Here, Plaintiff challenges the ALJ's finding that he was not credible concerning the extent to which his daytime drowsiness affects his ability to maintain employment. Plaintiff argues that the medical evidence supports his testimony, but his brief cites only to the April 2008 sleep study and other records from Dr. Medavaram confirming his diagnosis of obstructive sleep apnea.  (Doc. 21 at 13).  As discussed above, the ALJ provided a well-reasoned explanation for concluding that the medical records do not support a finding that the Plaintiff's functional capacity is as limited as he contends.  In addition, the ALJ cited ample evidentiary support for his finding that Plaintiff was not entirely credible.

First, the ALJ found that Plaintiff's allegations of extremely limited daily activities have "no basis in the record" given that he was able to work for years in spite of having sleep apnea and that the record contains "no evidence of any worsening in his condition." (R. 33). Second, the ALJ found Plaintiff not fully credible because, as discussed previously, his "treatment has been extremely sparse and sporadic," and Plaintiff's explanation that he did not seek treatment because he could not afford the $25 copayment was not persuasive, particularly in light of how much he spends on cigarettes per month. (R. 30, 33) ("While I recognize the addictive nature of tobacco, I nonetheless find that the claimant's choice to purchase cigarettes, rather than to seek treatment for an allegedly disabling condition, does not provide strong support for his claim."). Third, the ALJ found Plaintiff's treatment to be "conservative," citing as an example the lack of evidence that he takes any medication stronger than Tylenol for his alleged disabling pain or that he was referred for physical therapy for his back pain. (R. 33). Finally, the ALJ found that the Plaintiff's credibility was undermined by the lack of any medical evidence after May 2008 to indicate that he was unable to use a CPAP mask without nightmares, until Dr. Medavaram raised this issue in August 2010 shortly before the hearing, and even though Dr. Medavaram had authored opinions in the interim "which failed to mention any problems with the CPAP machine." (*Id.*).

Plaintiff's assertion in his brief that he complained of "'bad dreams'" and "episodes of not breathing" are unpersuasive and misleading given that the evidence he cites shows that he made those complaints solely within the first month of beginning use of the CPAP in May 2008, and that he complained to the medical supply company, not to any of his doctors. (Doc. 21 at 14, citing R. 464-65). The ALJ explains how Plaintiff's

credibility regarding his difficulty using the CPAP machine is undermined by his failure to bring these issues to the attention of his doctors and "the repeated lack of objective medical [evidence] or reports of nightmares with use of the CPAP machine, apart from when he first tried it." (R. 30). Moreover, the ALJ notes that Plainitff's credibility is further damaged by the lack of evidence that he underwent the recommended CPAP desensitization treatment. (*Id.*). Otherwise, Plaintiff cites only to his own subjective and self-serving testimony that he is unable to perform certain activities of daily living as evidence that he is credible concerning the disabling effect of his sleep apnea. (Doc. 21 at 13-14). For all these reasons, Plaintiff has failed to show that the ALJ's credibility determination lacks an "accurate and logical bridge" to the record evidence.

### 3. The RFC Determination

Plaintiff also challenges the RFC on the ground that the ALJ failed to adequately consider his sleep apnea and obesity in crafting the RFC determination.

In order to determine at Steps 4 and 5 of the analysis whether the claimant can perform his past relevant work or adjust to other work, the ALJ must first assess the claimant's RFC, which is defined as the most the claimant can do despite his limitations. *See* 20 C.F.R. §§ 404.1520(e), 404.1545; Social Security Ruling ("SSR") 96–8p, 1996 WL 374184, *2. This requires an ALJ to consider all functional limitations and restrictions that stem from medically determinable impairments, including those that are not severe. *See* SSR 96–8p, 1996 WL 374184, *5. In doing so, an ALJ is not permitted to "play doctor" or make independent medical conclusions that are unsupported by medical evidence or authority in the record. *Blakes ex rel. Wolfe v. Barnhart*, 331 F.3d 565, 570 (7th Cir. 2003); *Clifford*, 227 F.3d at 870. Nor may an ALJ selectively consider

medical reports. *Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009); *Godbey v. Apfel*, 238 F.3d 803, 808 (7th Cir. 2010). An ALJ need not discuss every piece of evidence, but must logically connect the evidence to the ALJ's conclusions. *See Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010); *Berger*, 516 F.3d at 544.

Plaintiff first argues that the ALJ's consideration of his obesity was insufficient because it consists only of a conclusory statement that the ALJ took into account the "exacerbatory impact of his obesity, in combination with his obstructive sleep apnea and other severe and non-severe impairments." (Doc. 21 at 15, citing R. 30). The Seventh Circuit has made clear that "[a]n ALJ must factor in obesity when determining the aggregate impact of an applicant's impairments." *Arnett v. Astrue*, 676 F.3d 586, 593 (7th Cir. 2012); *see also* SSR 02-1p, 2002 WL 34686281, *7 (When a claimant is found to have a medically determinable impairment of obesity, an ALJ is required to "consider any functional limitations resulting from the obesity in the RFC assessment.").

Here, the ALJ explicitly stated in several places in his decision that he considered Plaintiff's obesity (R. 28, 29, 30), and he also considered Plaintiff's obesity implicitly by referencing numerous medical reports, including the sleep study and the treating and consulting physician records and reports, that acknowledge Plaintiff's obesity and its impact on his other impairments. *See Outlaw v. Astrue*, 412 F. App'x 894, 898 (7th Cir. 2011) (holding that the ALJ considered the plaintiff's obesity, "albeit implicitly, when he referenced medical reports that acknowledged the relationship between [the plaintiff's] weight and his pain.") (citing *Prochaska v. Barnhart*, 454 F.3d 731, 736-37 (7th Cir. 2006); *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004)).

Even if this were not the case, the Seventh Circuit has held that "this type of error may be harmless when the RFC is based on limitations identified by doctors who specifically noted obesity as a contributing factor to the exacerbation of other impairments." *Pepper v. Colvin*, 712 F.3d 351, 364-65 (7th Cir. 2013) (citing *Prochaska*, 454 F.3d at 736-37). In this instance, both state agency consulting physicians noted Plaintiff's obesity in their RFC assessments. Dr. Aquino included it in his review of Plaintiff's medical history (R. 380), while Dr. Mack, in affirming Dr. Aquino's RFC assessment, expressly stated that Plaintiff "is morbidly obese, which would account for his alleged medical complaints" (R. 393). Accordingly, any error by the ALJ in failing to discuss Plaintiff's obesity more fully was harmless.

Plaintiff also asserts in conclusory fashion that the ALJ erred by not taking into account in the RFC assessment Plaintiff's "uncontrollably falling asleep." (Doc. 21 at 17). But as discussed above, the ALJ amply considered and discussed the lack of objective medical evidence and tests to support the argument that Plaintiff's daytime drowsiness merits a more restrictive RFC. The ALJ also provided sufficient support for his determination that Plaintiff's testimony concerning his sleepiness was not fully credible given the record evidence.

### 4. The Medical Vocational Guidelines (the "GRID")

Finally, Plaintiff argues that as an individual "approaching advanced age" as defined by the Medical Vocational Guidelines (the "Grid"), he would have been deemed disabled under the Grid had the ALJ restricted him to sedentary work. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 2, §§ 201.00(g), 201.12. But the ALJ did not restrict him to sedentary work, and for the reasons stated above, the RFC limiting Plaintiff to light work

is supported by substantial evidence. Accordingly, the Court need not consider whether a finding of disabled would have been required had the RFC been different.

## **CONCLUSION**

For the reasons stated above, Plaintiff's Motion for Summary Judgment [Doc. 21] is denied and Defendant's Motion for Summary Judgment [Doc. 31] is granted. The Clerk is directed to enter judgment in favor of Defendant.


ENTER:



Dated: August 5, 2013                    _____

SHEILA FINNEGAN
United States Magistrate Judge

27